IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**DANICA LOVE BROWN**,
individually and on behalf of all others
similarly situated,

Case No. 3:15-cv-01370-MO

        Plaintiff(s),

OPINION AND ORDER

   v.

**STORED VALUE CARDS, INC.**
(d/b/a **NUMI FINANCIAL**); and
**CENTRAL NATIONAL BANK AND
TRUST COMPANY, ENID, OKLAHOMA**,

        Defendants.

**MOSMAN, J.**,

Defendants move to compel arbitration of Plaintiff's claims based on the terms of the

cardholder agreement connected to the card Plaintiff was issued upon her release from jail.

Plaintiff opposes Defendants' Motion and argues that she never consented to the terms of the

cardholder agreement. For the reasons set forth below, I DENY Defendants' Motion to Compel

Arbitration [22] and order this case proceed to trial on the issue of arbitrability.

## BACKGROUND

Plaintiff Danica Love Brown was arrested, held at the Multnomah County jail, and

released the next day. At the time of her arrest, Ms. Brown had $30.97 in cash on her, all of

which was confiscated at booking. When she was released, Ms. Brown received a preloaded

NUMI card with a balance of $30.97. The NUMI card acts as a preloaded debit card. Holders of

the card can use it as a debit card to make routine purchases and can receive cash back from

those purchases. Holders can receive their money through an in-person bank teller withdrawal or

an online card-to-bank-account transfer.  Defendants claim both receiving money at the bank or through an online transfer of those options are cost-free ways for a holder to access her money. The card can also be used in ways that create significant fees for the holder.  For example, if the card is not emptied within five days after being issued, it begins to incur "monthly maintenance account fees" and other fees.  In addition, not all bank withdrawals or retail purchases are without a fee.  To help users, NUMI and Multnomah County typically provide the NUMI Prestige Prepaid MasterCard Cardholder Agreement (the "Cardholder Agreement"), a Debit Release Card Information form, and a Card Usage Tips form. Defendants claim these were provided to Ms. Brown when she received her card.  Ms. Brown claims she received neither the Cardholder Agreement nor Terms and Conditions with her NUMI card.  She does acknowledge receiving the Card Usage Tip form, which, while briefly outlining how to avoid some fees, lacks the detail of the Cardholder Agreement.  The parties dispute whether the Card Agreement is available online.

After receiving her card, Ms. Brown used it in various ways which incurred fees.  She now brings a class action suit opposing the imposition of fees on her and other similarly situated plaintiffs.  Defendants move to compel arbitration in accordance with the terms of the Cardholder Agreement and Ms. Brown's use of the card.  The Cardholder agreement provides, "**NOTICE: THIS AGREEMENT REQUIRES ALL DISPUTES BE RESOLVED BY WAY OF BINDING ARBITRATION UNLESS YOU OPT-OUT AS DETAILED IN THE ARBITRATION SECTION BELOW."**  The card requires the holder to sign it before use and states signing the card amounts to consenting to the Cardholder Agreement.

## LEGAL STANDARD

When a plaintiff denies he entered into a contract, '[t]o require the plaintiff to arbitrate . . . would be inconsistent with the first principle of arbitration that a party cannot be required to submit [to arbitration] any dispute which he has not agreed so to submit." *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1142 (9th Cir. 1991). Before a court orders arbitration "there should be an express, unequivocal agreement" between the parties to arbitrate. *Id.* "If there is doubt as to whether such an agreement exists, the matter. . .should be submitted to a jury." *Id.* Only in the absence of a genuine issue of material fact should the court decide whether the parties entered into an agreement. *Id.* (quoting *Par–Knit Mills, Inc. v. Stockbridge Fabrics Co.,* 636 F.2d 51 (3d Cir.1980)).

## DISCUSSION

The parties disagree on whether there was a valid contract to arbitrate. They further disagree, in the event that I find arbitration appropriate, which parties should be incuded in the arbitration. I address each issue, in turn, below. [1]

### A. Agreement to Arbitrate

"[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." *Mitsubishi Motors Corp. v. Soler Chrysler– Plymouth, Inc.,* 473 U.S. 614, 626, (1985). "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts . . . should apply ordinary state-law

---

[1]As a threshold issue, Defendants argue the scope of the arbitration agreement is to be decided by an arbitrator because the Cardholder Agreement delegates "gateway" questions of arbitrarily to the arbitrator. Whether they formed the agreement is for district courts to decide. The Federal Arbitration Act instructs "[a] court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*. To satisfy itself that such agreement exists, the court must resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce . . . [T]hese issues always include whether the clause was agreed to." *Granite Rock Co. v. Int'l Bhd. of Teamsters,* 561 U.S. 287, 297 (2010) (internal citations omitted).

principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, (1995); *Al-Safin v. Circuit City Stores, Inc.,* 394 F.3d 1254, 1257 (9th Cir. 2005).

Under Oregon law, to form a contract, there must be "a meeting of the minds of the parties, a standard that is measured by the objective manifestations of intent by both parties to bind themselves to an agreement." *Rick Franklin Corp. v. State Dept. of Trans.,* 207 Or. App. 183, 190, *rev. den.,* 342 Or. 116, 149 P.3d 138 (2006) (citation omitted).

Plaintiff argues that because she did not receive the Cardholder Agreement, she could not agree to it. Defendants offer evidence that it is the County's usual business practice to issue the Cardholder Agreement. In addition, they cite an Oregon case which found the combination of such a business practice and the holder's use of the card to be sufficient to form an agreement. *Karmolinski v. Equifax Info. Servs., LLC,* No. CIV. 04-1448-AA, 2005 WL 7213289, at *3 (D. Or. Oct. 31, 2005). However, the conclusion of the *Karmolinski* court rested on the fact that there was "no direct evidence as to receipt or non-receipt of a document." *Id.* In contrast, here there is direct evidence, offered by Plaintiff, that she did not receive the Cardholder Agreement. (Brown Decl. at 12.) As such, *Karmolinksi* is inopposite and there is a material issue of fact as to whether Ms. Brown received the Cardholder Agreement.

The question remaining is whether, without receipt of the Cardholder Agreement, Ms. Brown's use of the card indicates agreement. The card stated under the signature line "[u]se of this card constitutes acceptance of all terms and conditions set forth in the Cardholder Agreement." (Urhausen Decl., Ex. C.) Oregon courts have found "conduct in using [a] card constitute[s] mutual assent to the terms of the credit card agreement" when a plaintiff applies for and receives a consumer credit card along with a card agreement. *Citibank S. Dakota N.A. v. Santoro*, 210 Or. App. 344, 349 (2006). Oregon has never found an agreement where the card

holder did not apply for the card. Defendants' only support for this proposition is an unreported case from the Western District of Kentucky. *Baker v. Am. Express Travel Related Servs. Co.*, 2002 WL 1205065, at *2 (W.D. Ky. May 28, 2002) (Plaintiff was "charged with knowledge and acceptance of the terms that he could have read in the exercise of ordinary care.") I am not bound by this case and find its reasoning unpersuasive when applied to this case.

Of more relevance are two district court decisions addressing arbitration, debit cards, and jail. Recently, the Northern District of Georgia, in interpreting Georgia contract law, held that use of a prepaid ATM card received from a jail was *not* binding consent to the terms of an arbitration agreement even when the plaintiff had received a Cardholder Agreement.[2] *Regan v. Stored Value Cards, Inc.*, 85 F. Supp. 3d 1357, 1364 (N.D. Ga. 2015). The *Regan* court reasoned:

> "Unlike in [other cases finding consent], Plaintiff here did not make an application for the Card, he was not offered a line of credit that he could choose to use or not to use, he did not receive the Cardholder Agreement in the same envelope as the Card, and he had not used the card for a long period of time and made payments on the Card. Analogizing to cases containing these facts is not persuasive.
>
> Defendant's cited authority is even less persuasive due to another distinguishing factor: Plaintiff received the Card while he was being discharged *from jail, i.e. from a condition of absence of liberty of choice which Defendant reasonably could have anticipated.*"

*Id.* (emphasis in original). In *Regan,* the court denied Defendant's motion to compel arbitration and proceeded summarily to trial on the issue of whether a contract had been formed. *Id.* at 1364.

Defendants argue *Regan* is distinguishable from this case because Ms. Brown had a choice to accept her card. In *Regan*, there was no evidence the plaintiff understood he had the

---

[2] Interestingly, in *Citibank*, discussed above, the Oregon Court noted its agreement with Georgia law on the subject of assent by usage. *Citibank S. Dakota N.A. v. Santoro*, 210 Or. App. 344, 342, (2006).

ability to transfer the card balance to his bank account nor did he have the ability to withdraw funds, in person, at a bank. In the present case, Ms. Brown stated in her declaration, "I did not feel comfortable. . . [registering] for an online account to transfer the balance on my NUMI Card to my bank account because I did not wish to provide my personal and banking information to a company and website that I did not know, trust, or wish to do business with." (Brown Decl. at 17.) Defendants argue because Ms. Brown had cost free alternatives and knew she had cost free alternatives, she had a choice and by using the card she chose to assent to the terms of the Agreement. While this shows she was aware of other, fee-free options, Defendants assume Ms. Brown's option of giving up her bank information, and perhaps having to use the card to do so, constitutes a meaningful choice.

To support their argument, Defendants offer *Regan's* Florida counterpart, *Pope v. EZ Card & Kiosk, LLC*, another case addressing arbitration, debit cards, and jails. 2015 WL 5308852 (S.D. Fla. Sept. 11, 2015). The court in *Pope* determined arbitration was proper despite the fact the plaintiff "never assented to any terms of contract with Defendants." *Pope v. EZ Card & Kiosk LLC*, No. 15-61046-CIV, 2015 WL 5308852, at *1 (S.D. Fla. Sept. 11, 2015). While the plaintiff did not receive any agreement, terms, or conditions, he had opted to receive his money via debit card rather than via check when he was released from jail. The form the plaintiff signed noted the fees associated with the card and the option of receiving it via check. The *Pope* court distinguishes *Regan* by noting Regan was not given an opportunity to reject the card; was not given a cardholder agreement with the card; was not told of fees in his discharge paperwork; and did not sign the cardholder agreement. *Id.* at 4.

Our case is a closer analogy to *Regan* than to *Pope*. Taking the facts in the light most favorable to Ms. Brown, she did not receive the cardholder agreement; was not able to get it

elsewhere; and she did not sign the cardholder agreement. The option available in *Pope*—to receive a check—was not available here. Ms. Brown *had* to take the card and *had* to work through the Defendants' system in order to get her money back. Plaintiff presents evidence that "if an individual refuses to sign the Inmate Accounting System form, they are still given the card. If they refuse to take the Card, they are not refunded their money in any other form whatsoever." (Pl Resp. at 7, citing Audain Decl. Ex. E. ) Rather, the unclaimed money is put in a jail account waiting for them if they return. Defendants may argue a bank account transfer is the equivalent of a check, but the Card Usage Tips Plaintiff received indicate such an action may still need to be processed through the Defendants' company. It is not clear that Plaintiff was presented with a meaningful choice, as such I DENY the Motion to Compel [22] and this case proceeds to trial on the issue of arbitrability.

### B. Arbitration against SVC/NUMI

Plaintiff argues even if I find the arbitration agreement is in force, Defendant Stored Value Cards (SVC) is excluded from the agreement's scope. As this is a question of law, it is properly addressed before the trial resolving the ultimate question of whether arbitration will be required in this case.

In determining whether parties have agreed to arbitrate a dispute, I apply "general state-law principles of contract interpretation, while giving due regard to the federal policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration." *Mundi v. Union Sec. Life Ins. Co.,* 555 F.3d 1042, 1044 (9th Cir. 2009). The Ninth Circuit has recognized "estoppel" as a theory that can provide the basis for arbitration against non-signatories in two circumstances: 1) "where the non-signatory knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement," and 2) "because of

the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the non-signatory's obligations and duties in the contract and the fact that the claims were intertwined with the underlying contractual obligations." *Id.* at 1045-46.

In particular, the Ninth Circuit, when considering the estoppel argument for a non-signatory in the credit card agreement context, looked at 1) whether the claim was "intertwined with the credit card agreement;" 2) whether resolution of the claim requires review of the agreement; 3) whether the non-signatory is referenced or mentioned in the contract; and 4) whether the claim is based on the actions of the non-signatory. *Id.* Here, all four factors are met. The claim is intertwined with the cardholder agreement, which outlines how the card is to be used and what fees can be collected. In addition, the claim is based on the actions of SVC, the non-signatory, and requires that the contract, which outlines fess and daily limits, be reviewed. Finally, the contract clearly contemplates the participation of SVC/NUMI in the arrangement. The contract is titled "NUMI Prestige Prepaid MasterCard Cardholder Agreement" and within the contract NUMI is identified as the card servicer. Thus, if the trial establishes arbitration is appropriate, SVC/NUMI is to be a party to the arbitration.

## CONCLUSION

Due to the unresolved factual issues in the case at this time, as well as Plaintiff's lack of real alternatives when accepting the card, I find it appropriate to DENY Defendants' Motion to Compel [22]. If, after trial on the issue of arbitrability, arbitration is ordered SVC is to be a party to the arbitration.

DATED this ___25th___ day of February, 2016.

/s/ Michael W. Mosman
MICHAEL W. MOSMAN
Chief United States District Judge