# EXHIBIT 14

Page 1

1      UNITED STATES DISTRICT COURT
2       FOR THE DISTRICT OF OREGON
3           PORTLAND DIVISION
4
5  DANICA LOVE BROWN, individually  )
   and on behalf of all others      )
6  similarly situated,              )
                                    )
7            Plaintiffs,            )
                                    )
8       vs.                         )  Case No.
                                    )  3:15-cv-1370-MO
9  STORED VALUE CARDS, INC. (d/b/a  )
   NUMI FINANCIAL); and CENTRAL     )
10 NATIONAL BANK AND TRUST COMPANY, )
   ENID, OKLAHOMA,                  )
11                                  )
             Defendants.            )
12 _____)
13
14
15
16
17    VIDEOTAPED DEPOSITION OF JOANN TORZA
18           Carlsbad, California
19          Tuesday, March 6, 2018
20
21 Reported by:
22 Lorie Rhyne
23 RPR, CRR, CSR No. 12905
24
25 Job No.: 138592

1   after 72 hours?
2        A.   No.
3        Q.   So the services provided are the same?
4        A.   The same.
5        Q.   So the service fee is not conditioned on any
6   particular service provided to the cardholder?
7        A.   No.
8             MR. VERSCHELDEN:  Laura, you were talking
9   about the maintenance fee?
10            MS. GERBER:  That's right.
11       Q.   And are there individuals who have their
12  entire balance on the card depleted by the maintenance
13  fees?
14       A.   Many.
15       Q.   Do you know what percent?
16       A.   I don't.
17       Q.   Okay.  Can you explain a little more what
18  you mean by "many"?  Is that an absolute number?  I
19  mean, I know it's not, but --
20       A.   By "many" is -- from the times I have run
21  those queries, there's been a large majority that have
22  emptied the card right away or spent it right away.
23  The average load is $30 over the whole portfolio.  So
24  $30 is usually very easily spent right away, especially
25  if they understand how to use the card.  So the ones

1              What does that mean?
2         A.   ATM fees are passed through from the
3    networks to us, which is why there's not much leeway on
4    those ATM fees.  But the client fees are completely
5    within our control, so we felt it best to remedy in
6    that manner.  And in this instance, the cardholder
7    wasn't disputing they took out money on an ATM.  He
8    was -- sorry.  The actual dispute isn't in here, so
9    it's hard to see.  But we wanted to try and take care
10   of as much as of the fees as we could for him.
11        Q.   And when you say the ATM fees -- they're a
12   pass-through.  Is it a full pass-through, the amount
13   that the cardholder pays is exactly what Numi pays?
14        A.   I don't know if it's exactly.
15        Q.   You can set that one aside.
16        A.   Okay.
17             (Exhibit Number 171, Document, Bates
18             SVC025877 to SVC025992, marked for
19             identification, as of this date.)
20        Q.   I just handed you what's been marked
21   Exhibit 171 to your deposition, which has a Bates stamp
22   SVC25877 through 25882 -- I'm sorry -- through 25992.
23   Go ahead and take a moment to look at that document and
24   let me know when you're done.
25        A.   Okay.

Page 183

1   Q. Do you recognize this document?

2   A. I recognize as I wrote it, but I don't
3   remember it as of yesterday.

4   Q. Okay. So just to clarify, the cover e-mail
5   is an e-mail from you to Michele Dominguez and Vince Li
6   dated June 8, 2015, and there's some other e-mails
7   below that, and then there's an attachment starting at
8   25882 that says at the top, Service Charge Activity
9   Card Management, 6/7/15.

10         Starting with this attachment, do you
11  recognize that document?

12  A. I do.

13  Q. And what is this document?

14  A. This is one of the FIS Starview reports that
15  we use to enter our income, our revenue.

16  Q. And where do you look on here for the
17  revenue to enter?

18  A. If you go to the last page, because the last
19  page has the totals.

20  Q. Uh-huh.

21  A. So total amount charged was 8,781.81 for the
22  day. And then we have a subchart that we keep in Excel
23  that breaks down all these different codes for the type
24  of fee that was charged.

25  Q. And by "codes," you're talking about the

Page 184

1  codes that are listed to the left that say DEN through
2  276 --
3       A.   Correct.
4       Q.   -- is that correct?
5            And that amount charged of $8,781 -- is that
6  card loads or just transactions that were run through
7  by FIS on that one day?
8       A.   Those are the fees charged for that one day.
9  And then the column one, two, three, four -- five down,
10 total waived is the total count of fees waived for the
11 day, et cetera.
12      Q.   And is this a charge -- or is this report
13 for the entire Numi system?
14      A.   Yes.  This is one day.
15      Q.   Okay.  But it -- and it's for multiple
16 partners and facilities?
17      A.   Correct.  It's everybody, yes.
18      Q.   It's everyone, okay.
19           And if you look at the codes there --
20      A.   Um-hum.
21      Q.   -- do you know what DEN means?
22      A.   Denial.
23      Q.   Okay.  And then TXN-ATM withdrawal?
24      A.   Transaction ATM withdrawal.  That's a PIN --
25      Q.   Okay.

Page 185

1    A.    -- ATM withdrawal.
2    Q.    And the balance inquiry?
3    A.    That's a transaction PIN balance inquiry.
4    Q.    That you might make at an ATM or a merchant?
5    A.    Correct.
6    Q.    Okay. And then transaction PIN TRAN -- do
7  you know what that is?
8    A.    That's at a store running a debit
9  transaction.
10   Q.    Okay. And then do you know what 150 stands
11 for?
12   A.    150 through 276 are the weekly fee programs,
13 so those P1 through 7 -- one, two, three, four, five --
14 there's six of them that had a weekly fee assessed.
15   Q.    And do you know -- if a cardholder pays a
16 weekly fee 36 hours after the card is activated, is the
17 weekly fee then charged exactly seven days later?
18   A.    It depends. So FIS has a reporting time
19 period of 6:00 p.m. to 6:00 p.m. Central Time, so if a
20 card is loaded after that time, it's an additional day
21 before that seventh day hits.
22   Q.    Okay. And if you -- I'm going back to the
23 e-mail. If you look at the bottom e-mail for June 8,
24 2015 on page 25880 --
25   A.    All right.

1    Q.   -- you wrote, Our daily deposits have been 6
2  to 8 percent less than what we have been expecting.
3  Upon review of the CB1020 report from this last
4  weekend, it appears that the waived service charges for
5  denials and ATM withdrawals are the culprits.
6         What did you mean by that when you wrote
7  that?
8    A.   That because we were waiving service charges
9  for denials and ATM withdrawals, that that was the
10 reason for the dip in the revenue.
11   Q.   Okay.  And did that mean that those were
12 waivers that should not have occurred?
13   A.   It caused us to analyze whether they should
14 be set at that level.
15   Q.   Okay.  And then you write, We can't do much
16 about the waived ATM fees, but we would like to have
17 the denial fee charges waive after five occurrences
18 instead of three.
19         What does that mean?
20   A.   That, as I stated earlier, it was we will
21 let three charge and then we'd waive the rest.  So
22 instead we'd have five charge and waive the rest.
23   Q.   So you were proposing that a cardholder get
24 charged five denial fees and then after that, they
25 would be waived?

1   A.   Right.
2   Q.   Okay.  And do you know whether that change
3   was made?
4   A.   I don't know if that was ever put into place
5   or not.
6   Q.   Okay.  And do you know whether you had been
7   concerned about a decrease in daily deposits for some
8   time before this?
9   A.   It is something we evaluate once a week.  I
10  don't recall if it had dipped previously.
11  Q.   And is the change in denial fees something
12  that would need to be approved by Central National
13  Bank?
14  A.   It would be part of the terms and
15  conditions, so yes.
16  Q.   Okay.
17  A.   It would be escalated up.
18  Q.   And then if you look at page 25878, there's
19  an e-mail at the bottom there from Michele Dominguez
20  that says, No, there's no way in FIS's system to put a
21  cap on it.  We have to wait for cardholders to call and
22  complain, and then we immediately reverse all but three
23  of them.
24  A.   Um-hum.
25  Q.   So what does that mean exactly?

1  Q.  Okay.  So he had 10 denial fees charged to
2  him; is that correct?
3  A.  Could -- yes, according to this report.
4  Now, what you don't see is the call center report.  Did
5  Mr. -- did Mr. Hughley call in?  More than likely,
6  because he had trouble using this card.  At that point
7  we would have reversed the fees.
8  Q.  Okay.  But if he didn't call in --
9  A.  Correct.
10 Q.  -- there would be no reversal?
11 A.  Correct, due to the limitations of FIS.
12 Q.  Okay.  And if the fees were reversed, if it
13 was caught by the -- somehow and not because the -- not
14 because the cardholder had called in, was the
15 cardholder notified of the reversal?
16 A.  If there was a number on file to call, yes,
17 or --
18 Q.  Okay.  But if not, they were not notified?
19 A.  Correct.
20 Q.  Okay.  And was there any systematic review
21 set up by the call center to track these denial fees?
22 A.  Call center doesn't have access to the
23 Starview reporting just due to the multitude of
24 cardholder PANs.  It would be against PCI compliance
25 for that, so no.

Page 220

1   aside.
2              (Exhibit Number 176, E-mail string,
3         Bates SVC000098 to SVC000100, marked for
4         identification, as of this date.)
5       Q.   I've handed you what has been marked
6   Exhibit 176, which has a Bates stamp of SVC98
7   through -- well, let me get this right -- 100, and then
8   there's another document behind it that says SVC298
9   through 300, I believe.  You didn't get that?
10      A.   It's just blank.
11      Q.   Okay.  Never mind.  Hold on just a minute.
12           MS. GERBER:  We can go off the record for a
13  minute.
14           THE VIDEOGRAPHER:  The time is 3:57 p.m.,
15  and we are off the record.
16           (Pause.)
17           THE VIDEOGRAPHER:  The time is 3:58 p.m.,
18  and we're back on the record.
19  BY MS. GERBER:
20      Q.   So just to clarify, Exhibit 176 is just
21  SVC98 through 100.  Have you had a chance to look at
22  that document?
23      A.   Yes.
24      Q.   Okay.  And what is this document?
25      A.   Wanda Yantis reached out to us -- reached

Page 221

1  out to me in July of 2000 -- or June of 2015 asking for
2  some stats on the card program.  So this is an e-mail
3  regarding those -- that stat request due to FOIAs they
4  had received, the Freedom of Information Act requests
5  that they had received.
6       Q.   Okay.  And did you receive copies of the
7  FOIA requests that they had received?
8       A.   No.
9       Q.   Okay.  And so in order to respond,
10 Ms. Yantis would just reach out to you to ask for
11 information about the program; is that correct?
12      A.   Right.  There was just this one time.
13      Q.   Okay.  And do you know who the Freedom of
14 Information Act request was received from?
15      A.   I have no idea.
16      Q.   And if you look on page 99, there's a
17 May 21, 2015 e-mail.  And what -- was that also in
18 response to the FOIA information?
19      A.   Not to -- let's see here.
20           Yes.  I believe it had to do with a phone
21 call I had received from Captain Rader, who's the Dave
22 in this e-mail.
23      Q.   Okay.
24      A.   And then I would copy Wanda whenever I wrote
25 him.

```
 1                C E R T I F I C A T E

 2   STATE OF CALIFORNIA)

 3                      )ss:

 4   COUNTY OF SAN DIEGO)

 5

 6         I, LORIE RHYNE, Registered Reporter,

 7   Certified Realtime Reporter within and for the

 8   State of California, do hereby certify:

 9         That JOANN TORZA, the

10   witness whose deposition is hereinbefore set

11   forth, was duly sworn by me and that such

12   deposition is a true record of the testimony

13   give by such witness.

14         I further certify that I am not

15   related to any of the parties to this action

16   by blood or marriage and that I am in no way

17   interested in the outcome of this matter.

18         In WITNESS WHEREOF, I have hereunto

19   set my hand this 12th day of March, 2018.

20

21

22

23

24   _____
                  Lorie Rhyne
25        LORIE RHYNE, CSR 12905, RPR, CRR
```