**James L. Hiller, OSB #772220**
jhiller@hittandhiller.com
**HITT HILLER MONFILS WILLIAMS LLP**
411 SW Second Avenue, Suite 400
Portland, Oregon 97204
Telephone: (503) 228-5973
Facsimile: (503) 228-4250


**Eric J. Nystrom,** *Pro Hac Vice*
enystrom@foxrothschild.com
**John C. Ekman,** *Pro Hac Vice*
jekman@foxrothschild.com
**Natalie I. Uhlemann,** *Pro Hac Vice*
nuhlemann@foxrothschild.com
**FOX ROTHSCHILD LLP**
Two22 Tower, Suite 2000
222 South Ninth St.
Minneapolis, Minnesota 55402
Telephone: (612) 607-7000
Facsimile: (612) 607-7100
**Attorneys for Defendants**

<div align="center">

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

</div>

| | |
|---|---|
| DANICA LOVE BROWN, individually and on behalf of all others similarly situated,<br>                              Plaintiff,<br>v.<br><br>STORED VALUE CARDS, INC., d/b/a NUMI FINANCIAL, and CENTRAL NATIONAL BANK AND TRUST COMPANY, ENID, OKLAHOMA, n/k/a STRIDE BANK, N.A.,<br>                              Defendants. | **Case No. 3:15-cv-1370-MO**<br><br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**<br><br>**ORAL ARGUMENT REQUESTED** |

<div align="center">

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**

</div>

**TABLE OF CONTENTS**

**PAGE**

LOCAL RULE 7-1 CERTIFICATION..................................................................1

MOTION .........................................................................................................1

MEMORANDUM IN SUPPORT OF MOTION ..................................................1

I.     INTRODUCTION ..................................................................2

II.    FACTS ...................................................................................3

    A.    Plaintiff's Background and Arrest.......................................3

    B.    Plaintiff's Use of Her Numi Release Card...........................4

    C.    The Arbitration Provision in the Cardholder Agreement ....................5

III.    ARGUMENT..........................................................................7

    A.    A "TAKING" MUST BE COMPELLED AND UNAVOIDABLE. ....7

    B.    PLAINTIFF'S VOLUNTARY DECISION TO INCUR FEES ALSO REQUIRES THE DISMISSAL OF HER CONVERSION AND UNJUST ENRICHMENT CLAIMS.......................................10

        1.    Conversion.........................................................10

        2.    Unjust Enrichment .............................................12

    C.    PLAINTIFF'S EFTA CLAIMS ARE SUBJECT TO DISMISSAL UNDER EFTA SECTION 1693m BECAUSE DEFENDANTS RELIED IN GOOD FAITH ON THE FEDERAL RESERVE'S AND CFPB'S OFFICIAL INTERPRETATIONS OF THE RELEVANT EFTA PROVISIONS. ..................................................12

        1.    The CFPB's interpretation of section 1693*l*-1 explicitly recognized that jail release cards like the Numi Prepaid Release Cards were not "marketed to the general public." .....13

        2.    Before the adoption of the 2019 Prepaid Rule, the definition of "account" in section 1693i explicitly did not include pooled accounts that funded prepaid cards. ...............15

    D.    PLAINTIFF'S CLASS ACTION ALLEGATIONS FAIL BECAUSE ALL OTHER MEMBERS OF THE PUTATIVE

CLASS ARE SUBJECT TO INDIVIDUAL ARBITRATION REQUIRED BY THE CARDHOLDER AGREEMENT .................. 17

IV.    CONCLUSION ........................................................................................ 21

CERTIFICATE OF COMPLIANCE WITH L.R. 7-2(B)(2) ................................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdul-Baaqiy v. Fed. Nat'l Mortg. Ass'n*,
  149 F. Supp. 3d 1 (D.D.C. 2015) ..........................................................................20

*Allision v. Dolich*,
  148 F. Supp. 3d 1142 (D. Or. 2015)........................................................................7

*Atl. Nat'l Tr. v. Gunderson*,
  132 F. Supp. 2d 1284 (D. Or. 2000)......................................................................12

*Bank of N.Y. v. Fremont Gen. Corp.*,
  523 F.3d 902 (9th Cir. 2008) ................................................................................11

*Bridge Aina Le'a, LLC v. Land Use Commission*,
  950 F.3d 610 (9th Cir. 2020) ..................................................................................7

*Brown v. BYRV, Inc.*,
  2015 WL 4507159 (D. Or. July 24, 2015)............................................................19

*Brown v. Legal Found. of Wash.*,
  538 U.S. 216 (2003)................................................................................................9

*Brown v. Stored Value Cards, Inc.*,
  No. 3:15-cv-01370-MO, 2016 WL 4491836 (D. Or. Aug. 25, 2016)............. 13, 14

*In re Buffets, LLC*,
  No. 16-50557-RBK, 2019 WL 518318 (W.D. Tex. Feb. 8, 2019) .........................9

*Celotex Corp. V. Catrett*,
  477 U.S. 317 (1986) ................................................................................................7

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
  207 F.3d 1126 (9th Cir. 2000) ..............................................................................19

*Citibank South Dakota, N.A. v. Santoro*,
  210 Or. App. 344 (2006) ................................................................................18, 21

*Daniels v. Foster & Kleiser*,
  187 P. 627 (Or. 1920)............................................................................................11

*Dover v. Union Building and Loan Savings Bank*,
  No. 2:09-cv-708, 2009 WL 2612355 (W.D. Pa. Aug. 24, 2009)..........................13

*Edward D. Jones & Co. v. Mishler*,
   983 P.2d 1086 (Ore. Ct. App. 1999) ...................................................................12

*In re Evanston Nw. Corp. Antitrust Litig.*,
   No. 07-CV-04446, 2013 WL 6490152 (N.D. Ill. Dec. 10, 2013)...........................18

*Fennell v. Navient Solutions, LLC*,
   No. 6:17-cv-2083-Orl-37DCI, 2019 WL 3854815 (M.D. Fla. June 14, 2019) ....................20

*Granger v. Sears Roebuck & Co.*,
   No. 2:05-CV-1696-RDP, 2008 WL 11424140 (N.D. Ala. Aug. 4, 2008) ...........................20

*Gutierrez v. Wells Fargo Bank, N.A.*,
   889 F.3d 1230 (11th Cir. 2018)............................................................................18

*In re H&R Block IRS Form 8863 Litig.*,
   No. 4:13-MD-02474-FJG, 2015 WL 13344628 (W.D. Mo. Jan. 7, 2015)...........................20

*Hernandez v. Spacelabs Medical, Inc.*,
   343 F.3d 1107 (9th Cir. 2003) ..............................................................................7

*Jackson v. Aliera Cos., Inc.*,
   No. 19-cv-01281-BJR, 2020 WL 4787990 (W.D. Wash. Aug. 18, 2020) ...........................18

*Johnson v. Rustad & Assocs.*,
   2012 WL 5994933 (D. Minn. Nov. 30, 2012) ........................................................11

*Knick v. Township of Scott*,
   139 S. Ct. 2162 (2019) ..........................................................................................7

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 1 (1983)................................................................................................19

*Mossberg v. Univ. of Oregon*,
   247 P.3d 331 (Or. Ct. App. 2011) .................................................................. 10, 11

*Mustola v. Toddy*,
   456 P.2d 1004 (Or. 1969) ...................................................................................10

*In re Online Travel Co.*,
   953 F. Supp. 2d 713 (N.D. Tex. 2013)..................................................................20

*Outdoor Media Dimensions, Inc. v. State*,
   945 P.2d 614 (Or. Ct. App. 1997)........................................................................11

*Pablo v. ServiceMaster Global Holdings, Inc.*,
   No. C 08-03895 SI, 2011 WL 3476473 (N.D. Cal. Aug. 9, 2011) .........................21

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM
IN SUPPORT**

*Savko v. Rollins,*
    749 F. Supp. 1403 (D. Md. 1990) ................................................................8, 9

*Schneider v. Cal. Dep't of Corrections,*
    345 F.3d 716 (9th Cir. 2003) ......................................................................9

*Smith v. Bayer Corp.,*
    564 U.S. 299 (2011) ................................................................................17

*Student Loan Mktg. Ass'n v. Riley,*
    104 F.3d 397 (D.C. Cir. 1997) ..................................................................8

*United States v. Sperry Corp.,*
    493 U.S. 57 ..............................................................................................8

*Webb's Fabulous Pharmacies, Inc. v. Beckwith,*
    449 U.S. 155 (1980) ............................................................................9, 10

*Willamette Crest Gaming, LLC v. Play N Trade Franchise, Inc.,*
    2009 WL 2243811 (D. Or. July 27, 2009) ...............................................19

*Winters v. County of Clatsop,*
    150 P.3d 1104 (Or. Ct. App. 2007) ..........................................................12

**Statutes**

9 U.S.C. § 2 ..................................................................................................19

12 U.S.C. § 1002(12)(C) ..............................................................................13

12 U.S.C. § 1024(b)-(c) ...............................................................................13

12 U.S.C. § 5481(12)(C) ..............................................................................13

12 U.S.C. § 5514(b)-(c) ...............................................................................13

12 U.S.C. § 5515(b)-(c) ...............................................................................13

15 U.S.C. § 1693i(a) ....................................................................................15

15 U.S.C. § 1693*l*-1 (a)(2)(D)(iv) ...........................................................13, 14

15 U.S.C. § 1693m(d)(1) .............................................................................12

Credit Card Accountability Responsibility and Disclosure Act of 2009 ..............15, 16

Dodd Frank Wall Street Reform and Consumer Protection Act of 2010 ....................13

Federal Arbitration Act ................................................................................19

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM
IN SUPPORT**

## Other Authorities

12 C.F.R. § 1005.2 ..........................................................................................................15

12 C.F.R. § 1005.20(b)(4) ...................................................................................... 13, 14

124 Cong. Rec. 25743 (1978) (statement of Rep. Barnard) ...........................................12

71 Fed. Reg. 51437, 51441 (Aug. 30, 2006) ................................................................15

75 Fed. Reg. 80335, 80336 (Dec. 22, 2010).................................................................16

77 Fed. Reg. 30923, 30924–25 (May 24, 2012) ...........................................................15

81 Fed. Reg. 83934, 83946–49, 83970, 83965–66 (Nov. 22, 2016)....................... 16, 17

83 Fed. Reg. 6364, 6369 (Jan. 9, 2018) ........................................................................15

CFPB Official Staff Commentary on Reg. E, Fed. Reg. 6-5480.74, 2012 WL
    2563634, at *9 (Jan. 2016) ....................................................................................14

Federal Rules of Civil Procedure Rules 56 and 23 ..........................................................1

L.R. 7-1............................................................................................................................1

L.R. 7-1(a)(1)(A) .............................................................................................................1

L.R. 7-2(B)(2)................................................................................................................22

L.R. 7-2(b), 26-3(b), 54-1(c) ........................................................................................22

Restatement (Second) of Torts ......................................................................................10

United States Constitution, Fifth Amendment, Takings Clause ...............................7, 10

## LOCAL RULE 7-1 CERTIFICATION

Pursuant to L.R. 7-1(a)(1)(A), counsel for defendants Stored Value Cards, Inc., d/b/a NUMI Financial ("NUMI") and Central National Bank and Trust, n/k/a Stride Bank, N.A. ("CNB") (collectively, "defendants"), certify that on August 13, 2020 the parties made a good faith effort by telephone to resolve the issues raised by this motion for summary judgment but were unable to do so.

## MOTION

Pursuant to this Court's July 22, 2020 Order and Rules 56 and 23 of the Federal Rules of Civil Procedure, defendants move the Court for an order granting summary judgment in their favor on all the claims in plaintiff's Third Amended Complaint and dismissing or striking the class allegations contained therein.

## MEMORANDUM IN SUPPORT OF MOTION

Each of the claims asserted in plaintiff's Third Amended Complaint fail as a matter of law, and accordingly, defendants are entitled to summary judgment dismissing this action in its entirety. First, plaintiff's takings claim fails because the undisputed facts establish that plaintiff was never compelled to incur any fees. Second, because plaintiff was never compelled to incur any fees, her conversion and unjust enrichment claims likewise fail as a matter of law. Third, plaintiff's EFTA claims fail under EFTA section 1693m because defendants relied in good faith on official Board of Governors of the Federal Reserve ("Federal Reserve") and CFPB interpretations of the relevant provisions of the EFTA. Finally, to the extent they are not mooted by dismissal of plaintiff's enumerated causes of action, plaintiff's class allegations should be dismissed or stricken because the putative class members received and used the release card products subject to the Terms and Conditions of the Cardholder Agreement, which subjects all putative class members to individual

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**

arbitration. Discovery in this matter has been completed, and because of the incurable defects in plaintiff's claims, there are no viable issues for trial.

## I.    INTRODUCTION

The widespread adoption of prepaid card products have transformed the traditional practice in correctional facilities of confiscating inmates' cash and returning it with a paper check or cash. Prepaid MasterCard, Visa, and Discover debit card products eliminate the need for cash and checks and facilitate in-person, online, kiosk, and contactless digital wallet purchases. In switching from the use of paper checks to the use of prepaid debit cards that facilitate these types of transactions, government institutions such as the Multnomah County Jail are simply responding to the realities of contemporary e-commerce life.

Contracting with Numi allows Multnomah County to shift a burdensome and costly check administration process to Numi and focus the county's resources on more fundamental tasks. Numi's prepaid MasterCard debit cards, unlike a check, provide immediate liquidity, and eliminate the burden and cost for individuals being released from jail with trying to cash a paper check, particularly during non-traditional bank hours when a significant number of individuals are released. A prepaid card may be used immediately, almost anywhere (including online), at nearly any time of day or night, regardless of whether the cardholder has a checking account or proper identification.

Individuals, such as plaintiff, who nevertheless object to receiving a MasterCard prepaid debit card have multiple options to convert the card back to cash: they can walk into a bank and ask for a cash advance from a teller, they can go online and transfer the balance of the card to their bank account, or they can obtain cash back at a cash register—all without incurring any fees.

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**

Here, plaintiff read the detailed information provided to her about her MasterCard prepaid debit card and knowingly chose to incur completely avoidable fees. And defendants complied in good faith with the Federal Reserve and CFPB's official commentary and guidance regarding the relevant provisions of the EFTA. For these reasons, plaintiff's Third Amended Complaint must be dismissed. Additionally, the class allegations in the Third Amended Complaint are independently subject to dismissal because the arbitration provision in the Cardholder Agreement makes all other putative class members' claims subject to individual arbitration.

## II.    FACTS

Recognizing that the facts previously have been exhaustively briefed, defendants briefly summarize the undisputed facts here for the convenience of the Court.

### A.    Plaintiff's Background and Arrest

Plaintiff is a graduate student at Portland State University's School of Social Work. (ECF No. 149-1 at 15:6-14.) She has a savings account and a checking account at Rivermark Credit Union. (*Id.* at 56:15-23.) Plaintiff has a computer at her office and her home, and also owns a smart phone. (*Id.* at 55:24-56:10.) Each of these devices has internet access. (*Id.*) Plaintiff pays her bills online, has her paycheck direct deposited into her bank account, and transfers funds from her savings account to her checking account online. (*Id.* at 60:20-61:3.) Plaintiff uses her debit card for "everything." (*Id.* at 60:5-8.) And she rarely writes checks; usually just to send money to people that do not have access to electronic banking. (*Id.* at 59:1-8.)

Plaintiff was arrested on November 25, 2014, at a protest of Officer Darren Wilson's acquittal in the Michael Brown shooting. (*Id.* at 33:4-14, 71:1-10.) After she was taken to jail, her property was confiscated, including her backpack, phone, wallet, and medical supplies. (*Id.* at 74:5-18.) Plaintiff had $30.97 in cash in her possession when she was arrested. (*Id.* at 78:16-79:11.) Plaintiff received a Numi release card with a balance of $30.97 when she was released. (*Id.*)

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**

**B.**      **Plaintiff's Use of Her Numi Release Card**

Multnomah County provided plaintiff printed disclosures with her Numi release card. (*Id.* at 81:10-17.) Plaintiff looked at, but did not read, the documents provided to her because she did not have her glasses. (*Id.* at 84:17-85:5.) She also reviewed the back of the Numi release card and went to Numi's website after receiving the release card. (*Id.* at 88:12-15, 91:7-21.) Plaintiff remembers seeing on the back of the Numi release card that there was a service fee of $5.95. (*Id.* at 89:6-18.) She also remembers receiving Numi's Card Usage Tips brochure. (*Id.* at 93:5-94:9.)

The back of the Numi card states that a $5.95 service fee is incurred "5 days after card activation." (3/2/2018 Golden Declaration, ECF No. 150, ¶ 16.)

The Usage Tips brochure states:

> NO FEE for signature purchases
>
>> 1.      Swipe card
>>
>> 2.      Select "Credit" at the register
>>
>> 3.      Sign your receipt

(ECF No. 149-4.) The Usage Tips brochure also has a section entitled "How to avoid Service Fees," which states:

- Do not lose your funds to fees! Your card will incur the first monthly account maintenance fee 5 days after card activation.

- Go online to www.numicard.com and sign up for an online account. You will be able to transfer money to your bank account anytime at no charge.

- NO FEE for cash back at cashier!

>> 1.      Swipe card
>>
>> 2.      Select "Debit" at the register
>>
>> 3.      Enter PIN

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**
Page 4

4.    Select amount of cash back and select Enter or Submit.

(*Id.*)

The Usage Tips brochure detailed card usage fees and highlighted which transactions incurred fees and which were free. (*See id.*) The fees associated with the Numi release card were also set forth in the terms and conditions provided with the card. (ECF No. 149-6.) By reviewing the documents provided to her and visiting Numi's website, plaintiff came to understand the different ways she could use her Numi release card. (ECF No. 149-1 at 116:6-117:11.)

Plaintiff elected to use her Numi release card to make routine electronic transactions; for example, she used it to buy coffee. (*Id.* at 129:25-131:6-12.) She did not try to use the card in one of the disclosed ways to avoid fees. (*Id.* at 130:14-21.) Plaintiff explained that she did not want to transfer the funds on her Numi release card to her bank account because she did not want to provide Numi with her bank routing and account numbers. (*Id.* at 134:23-135:3.) While plaintiff admitted she was comfortable with the idea of electronic banking and transferring funds online, she did not want to have any further engagement with Numi. (*Id.* at 136:8-137:1.)

Plaintiff also admitted that there are "a lot of banks downtown" where she could have gone to withdraw her funds for free, but that it would have been inconvenient for her to do so. (*Id.* at 138:5-139:8.) Plaintiff acknowledges that a card can be used in more instances than a check. (*Id.* at 155:17-156:3.) And, plaintiff admits that she could ***not*** have used a check to pay for the purchases she made with her Numi release card. (*Id.*)

**C.    The Arbitration Provision in the Cardholder Agreement**

The Cardholder Agreement establishes the "Terms and Conditions governing . . . use of the NUMI Prestige Prepaid MasterCard." (ECF No. 149-6.) The agreement provides that, "[b]y accepting this card, you agree to be bound by these terms and conditions." (*Id.*) The back of the

release card similarly provides that "[u]se of this card constitutes acceptance of all terms and conditions set forth in the Cardholder Agreement." (ECF No. 149-5.)

The Cardholder Agreement contains a broad arbitration provision. The agreement provides, "**NOTICE: THIS AGREEMENT REQUIRES ALL DISPUTES BE RESOLVED BY WAY OF BINDING ARBITRATION UNLESS YOU OPT-OUT AS DETAILED IN THE ARBITRATION SECTION BELOW**." (ECF No. 149-6, § 33 (capitalization and bold in original).) The arbitration provision defines an arbitrable claim as:

> any claim, demand, dispute or controversy between you and us that in any way arises from or relates to your Card Account (whether past, present or future). For purposes of this Agreement, the term "Claim" shall have the broadest possible meaning.

(ECF No. 149-6, § 33(c).) The Cardholder Agreement gives the cardholder the opportunity to opt-out of arbitration in writing within thirty days of receiving the agreement (*id.*, § 33(b) (opt-out provision highlighted in Cardholder Agreement in bold)), or avoid arbitration by filing an action in small claims court. (*Id.*, § 33(c).) Any claims are to be referred to either the Judicial Arbitration and Mediation Services ("JAMS"), or the American Arbitration Association ("AAA"), unless the parties mutually agree to another forum. (*Id.*, § 33(e).)

//

//

//

//

//

//

//

//

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**

## III.    ARGUMENT

A party is entitled to summary judgment when that party shows there is an absence of evidence supporting any element essential to the plaintiff's claim. *Allision v. Dolich*, 148 F. Supp. 3d 1142, 1149 (D. Or. 2015) (citing *Celotex Corp. V. Catrett*, 477 U.S. 317, 323-24 (1986)). To survive a summary judgment motion, a plaintiff has the burden of providing specific and material facts to support each element of her prima facie case. *Id*. "A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements." *Allision*, 148 F. Supp. at 1149 (citing *Hernandez v. Spacelabs Medical, Inc*., 343 F.3d 1107, 1112 (9th Cir. 2003)).

## A.    A "TAKING" MUST BE COMPELLED AND UNAVOIDABLE.

The Takings Clause of the Fifth Amendment of the United States Constitution prohibits the taking of private property for public use without just compensation. *Bridge Aina Le'a, LLC v. Land Use Commission*, 950 F.3d 610, 625 (9th Cir. 2020) (citing *Knick v. Township of Scott*, 139 S. Ct. 2162, 2167 (2019)). A "classic" taking occurs "when the government directly appropriates private property or ousts the owner from his domain." *Id*. (quotation omitted). A *per se* regulatory taking, by contrast, occurs in one of two ways. *Id*. In a *Loretto* taking, the government requires an owner to suffer a permanent physical invasion of his or her property. *Id*., n.6 (citations and quotations omitted). In a *Lucas* taking, a regulation completely deprives the owner of *all* beneficial use of his or her property. *Id*. at 626. A third type of regulatory taking, a *Penn Central* taking, is not a *per se* taking, but rather is "functionally equivalent to the classic taking." *Id*.

Plaintiff's takings theory is not expressed in the Third Amended Complaint, but appears to allege a *Penn Central* regulatory taking based upon "a governmental user fee that fails to bear a sufficient relationship to the value received or fails to provide a fair approximation of the costs of the benefits supplied[.]" (*See* Third. Am. Compl., ¶ 45.) This theory fails as a matter of law,

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**

however, because plaintiff admits that the fees she incurred while using her prepaid card were avoidable. (ECF No. 149-1 at 129:25-137:1.)

Fundamentally, a fee cannot form the basis for any form of taking, whether classic, *per se* regulatory, or *Penn Central*, where a person voluntarily incurs an avoidable fee. The case law demonstrates that in order for a government action to constitute a taking, it must be mandatory and unavoidable. For example, in a factually similar scenario in *Savko v. Rollins*, a group of inmates brought a Takings Clause challenge to a statutory requirement that they mail their confiscated property to a person outside the institution at their own expense. 749 F. Supp. 1403, 1414 (D. Md. 1990). The court rejected their takings theory because there were multiple options available to the inmates for handling their confiscated property, and they would only incur postage fees if they chose to mail their property:

> Inmates are offered three alternatives with respect to property confiscated pursuant to [statute]. ***The regulation does not force inmates to mail the confiscated property to persons outside the institution and thereby incur postage fees***.

*Id*. (emphasis added).

By contrast, in *United States v. Sperry Corp.*, where a taking was found, the fee itself—a 2% deduction from an arbitral award—was involuntarily and automatically deducted from all arbitral awards, without offering arbitral award recipients any options for avoiding the fee. 493 U.S. at 57. The mandatory nature of the fee itself was self-evident. *See id.* ("On June 7, 1982, the Department of the Treasury issued a 'Directive License' requiring the Federal Reserve Bank of New York to deduct 2% from each award certified by the Tribunal and to pay the deducted amount into the Treasury[.]").

Precisely because they are avoidable, prospective fees cannot constitute takings. *See*, *e.g*., *Student Loan Mktg. Ass'n v. Riley*, 104 F.3d 397, 404 (D.C. Cir. 1997) (rejecting a takings-based

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**
Page 8

challenge to a statutory fee to be applied prospectively because "the affected parties can take measures to protect themselves against, or at least mitigate, the otherwise resulting loss"); *In re Buffets*, *LLC*, No. 16-50557-RBK, 2019 WL 518318, at *6 (W.D. Tex. Feb. 8, 2019) (holding that prospective application of a statutory fee would "avoid constitutional violations" because "future debtors may select pre-packaged plans or choose to restructure debts outside of bankruptcy to avoid the quarterly fees.").

As demonstrated by the case law, and contrary to plaintiff's allegations, it is the avoidability of the *fee itself*—not the use of the account or services to which it relates—that is dispositive when a fee is alleged to be a taking. *See Brown v. Legal Found. of Wash.*, 538 U.S. 216, 224 (2003) (listing as an "essential feature" of the IOLTA program "the *requirement* that the lawyers direct the banks to pay the net interest on the IOLTA accounts to the Legal Foundation of Washington") (emphasis added); *Webb's Fabulous Pharmacies*, *Inc. v. Beckwith*, 449 U.S. 155, 158 (1980) (county clerk unilaterally retained interest in an interpleader account, with no way for the plaintiff to avoid such retention); *Schneider v. Cal. Dep't of Corrections*, 345 F.3d 716, 720 (9th Cir. 2003) (no way to opt out of a California statute that *required* that interest accrued on inmate trust accounts be paid to an inmate welfare fund).

The fees plaintiff incurred here were avoidable, and consequently, were not takings. As in *Savko*, plaintiff had multiple options to obtain her cash back without incurring any fees. Plaintiff was aware of these options and voluntarily chose not to exercise them. For example, plaintiff explained during her deposition that she did not want to transfer the funds on her Numi release card to her bank account because she did not want to provide Numi with her routing and account numbers. (ECF 149-1 at 134:23-135:3.) Plaintiff also admitted that there are "a lot of banks downtown" where she could have gone to withdraw her funds for free, but stated that it would

have been "inconvenient" for her to do so. (*Id.* at 138:5-139:8.) Instead, plaintiff chose not to avoid the fees, and voluntarily used her card for everyday purchases such as coffee. (*Id.* at 155:17-156:3.)

Plaintiff has yet to identify any authority where a person who chose to incur an avoidable fee stated a viable claim for violation of the Takings Clause of the Fifth Amendment. Because plaintiff has not and cannot establish that she was compelled to incur an unavoidable fee, Count One of the Third Amended Complaint should be dismissed.

## B.    PLAINTIFF'S VOLUNTARY DECISION TO INCUR FEES ALSO REQUIRES THE DISMISSAL OF HER CONVERSION AND UNJUST ENRICHMENT CLAIMS.

Plaintiff's common law claims of conversion and unjust enrichment also fail because the fees she incurred were avoidable and voluntary.

### 1.    Conversion

Under Oregon law, "[t]o state a claim of conversion, a party must establish the intentional exercise of dominion or control over a chattel that so seriously interferes with the right of another to control it that the actor may justly be required to pay the full value of the chattel." *Mossberg v. Univ. of Oregon*, 247 P.3d 331, 334 (Or. Ct. App. 2011) (quotation omitted). As the Court correctly noted at the August 1, 2018 summary judgment hearing, providing an inmate whose cash has been confiscated with a prepaid card that has certain benefits over cash or a check does not seriously interfere with the inmate's right to control the cash. (ECF No. 193 at 40-41.)

But there are many additional reasons that plaintiff's conversion claim is not viable. First, plaintiff consented to the conduct that is alleged to constitute conversion, and consent is an absolute defense to the tort of conversion. Oregon law incorporates the Restatement (Second) of Torts. *Mustola v. Toddy*, 456 P.2d 1004 (Or. 1969). Section 252 of the Restatement provides that "[o]ne who would otherwise be liable for trespass to a chattel or for conversion is not liable to the extent that the other has effectively consented to the interference with his rights." Comment b to section

252 explains further that this rule "applies whenever the consent has been given by the person who is seeking recovery[.]"

Second, and relatedly, plaintiff ratified the conduct that is alleged to constitute conversion. As a matter of law, no conversion exists where "an owner either expressly or impliedly assents to or ratifies the taking, use, or disposition of his property." *Bank of N.Y. v. Fremont Gen. Corp.*, 523 F.3d 902, 914 (9th Cir. 2008). Here, plaintiff admits that she could have taken the minimal actions required to avoid incurring fees, but chose not to do so for personal reasons, namely, she did not want to provide Numi with any information and she found it inconvenient to go to a bank. Thus, plaintiff voluntarily relinquished the very right to control her chattel that is a prerequisite for a conversion claim. *See Mossberg*, 247 P.3d at 334; *Outdoor Media Dimensions*, *Inc. v. State*, 945 P.2d 614, 618 (Or. Ct. App. 1997) ("Generally, when property is lawfully taken, there is no conversion").

Third, plaintiff has presented no evidence that she demanded the return of the $6.90 in fees that she incurred, or that defendants refused any such demand. *See*, *e.g.*, *Daniels v. Foster & Kleiser*, 187 P. 627, 628 (Or. 1920) ("[O]rdinarily a demand must be made for the property, followed by a refusal to deliver, in order to work a conversion"). Plaintiff is not permitted to simply presume that defendants would have refused to return the $6.90 to her, had she actually asked.

Finally, plaintiff's decision to incur fees rather than submit information on Numi's website or go to a bank is fatal to her claim that she suffered damages. *Cf. Johnson v. Rustad & Assocs.*, Inc., No. 12-CV-0926 (PJS/SER), 2012 WL 5994933, at *4 (D. Minn. Nov. 30, 2012) (holding that plaintiff who affirmatively agreed to pay an ATM fee before the ATM would dispense cash to him "suffered no actual damages.").

2.      **Unjust Enrichment**

Unjust enrichment "requires 'a benefit conferred, awareness by the recipient that a benefit has been received and, under the circumstances, it would be unjust to allow retention of the benefit without requiring the recipient to pay for it.'" *Atl. Nat'l Tr. v. Gunderson*, 132 F. Supp. 2d 1284, 1288-89 (D. Or. 2000) (quoting *Edward D. Jones & Co. v. Mishler*, 983 P.2d 1086, 1101 (Ore. Ct. App. 1999)). Here, as the Court has previously noted, there is no "enrichment" where cash is confiscated and replaced with something that is its functional equivalent. (ECF No. 193 at 40-41.) In addition, there is no injustice in allowing Numi to retain a fee that plaintiff knowingly and willingly incurred. *See Atl. Tr.*, 132 F. Supp. 2d at 1288-89; *Winters v. County of Clatsop*, 150 P.3d 1104, 1108 (Or. Ct. App. 2007) (holding it is "not unjust" to honor the terms of the bargain that the plaintiff had accepted).

**C.      PLAINTIFF'S EFTA CLAIMS ARE SUBJECT TO DISMISSAL UNDER EFTA SECTION 1693m BECAUSE DEFENDANTS RELIED IN GOOD FAITH ON THE FEDERAL RESERVE'S AND CFPB'S OFFICIAL INTERPRETATIONS OF THE RELEVANT EFTA PROVISIONS.**

Defendants are not liable to plaintiff under the EFTA because they acted in good faith in conformity with the Federal Reserve's and CFPB's interpretation of sections 1693*l*-1 and 1693i. Section 1693m(d)(1) of the EFTA provides:

> No provision . . . of this title imposing any liability shall apply to . . . any act done or omitted in good faith in conformity with any rule, regulation, or interpretation thereof by the Bureau or the Board or in conformity with any interpretation or approval by an official or employee of the Bureau of Consumer Financial Protection or the Federal Reserve System duly authorized by the Bureau or the Board to issue such interpretations or approvals under such procedures as the Bureau or the Board may prescribe therefor[.]

15 U.S.C. § 1693m(d)(1). This good faith reliance exception was founded on the belief that "[a]n institution should have a clear reference source to enable it to know what it must do to comply with the Act." 124 Cong. Rec. 25743 (1978) (statement of Rep. Barnard).

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**
Page 12

A defendant is entitled to the good faith reliance exception where it acts in conformity with written guidance provided by the relevant regulatory authority. For example, in *Dover v. Union Building and Loan Savings Bank*, the defendant bank complied with the notification requirements for transaction fees that were found in the FDIC's Compliance Examination Handbook. No. 2:09-cv-708, 2009 WL 2612355, at *6 (W.D. Pa. Aug. 24, 2009). Although the plaintiff alleged that defendant was required to provide an on-screen notice of the transaction fee under the EFTA, the FDIC Compliance Examination Handbook gave the bank the choice of either posting notice of a fee in a prominent and conspicuous location, or providing the notice on screen or in paper form. *Id*. at *2-4. The court emphasized that the EFTA specifically delegated enforcement authority to the FDIC to ensure compliance of non-member banks. *Id*. at *6. And because the defendant bank had acted in conformity with the FDIC's guidance, the plaintiff's EFTA claims were dismissed for failure to state a claim. *Id*.

This case presents a remarkably similar scenario. The Dodd Frank Wall Street Reform and Consumer Protection Act of 2010 transferred rule-making authority under the EFTA from the Federal Reserve to the CFPB. 12 U.S.C. §§ 1002(12)(C), 1024 (b)-(c); 12 U.S.C. § 5481(12)(C), 5514(b)-(c), 5515(b)-(c). And Defendants complied in good faith with the Federal Reserve's and CFPB's official Regulation E commentary with respect to both section 1693*l*-1 and section 1693i.

1.    **The CFPB's interpretation of section 1693*l*-1 explicitly recognized that jail release cards like the Numi Prepaid Release Cards were not "marketed to the general public."**

The EFTA provisions covering general-use prepaid cards exempt from their coverage cards that are "not marketed to the general public." 15 U.S.C. § 1693*l*-1 (a)(2)(D)(iv); 12 C.F.R. § 1005.20(b)(4); *Brown v. Stored Value Cards, Inc.*, No. 3:15-cv-01370-MO, 2016 WL 4491836, at *1-2 (D. Or. Aug. 25, 2016). According to the CFPB's official commentary, a prepaid card is "marketed to the general public" only if the potential use of the card is "directly or indirectly

offered, advertised, or otherwise promoted to the general public." CFPB Official Interpretation of Paragraph 20(b)(4), 12 C.F.R. § 1005.20(b)(4) (Supplement I); *Brown*, 2016 WL 4491836 at *2 (citation omitted). Factors to consider in determining whether this exclusion applies include:

> [T]he means or channel through which the card, code, or device may be obtained by a consumer, the subset of consumers that are eligible to obtain the card, code, or device, and whether the availability of the card, code, or device is advertised or otherwise promoted in the marketplace.

CFPB Official Staff Commentary on Reg. E, Fed. Reg. 6-5480.74, 2012 WL 2563634, at *9 (Jan. 2016).

Here, the only way for an individual to obtain a Numi prepaid release card is to be arrested and released from a correctional facility that has a contract with Numi—no one else is eligible to receive such a card, and the only audience eligible to distribute the cards is government correctional facilities. Consequently, the Ninth Circuit's expansive interpretation of "general public" to include non-general, uniquely situated groups of inmates who only receive cards upon release from incarceration, and "marketplace" to include a county jail, was not foreseeable to defendants.

Moreover, the Ninth Circuit's expansive interpretation of "general public" directly conflicts with the CFPB's interpretive commentary and effectively vitiates the exception contained in section 1693*l*-1(a)(2)(D)(iv). The CFPB's official interpretation of the April 2019 amendments to Regulation E (the "2019 Prepaid Rule") explicitly identifies "prison release cards" as cards that are "not marketed to the general public":

> Many commenters . . . urg[ed] the Bureau to adopt additional exclusions for other types of products considered prepaid accounts under the 2016 Final Rule. For example, several of these commenters . . . urged the Bureau to exclude ***products that are not marketed to the general public***, ***such as*** utility company refund cards, jury duty cards, ***prison release cards***, and cards attached to qualified tuition savings plans (*e.g.*, 529 plans).

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**
Page 14

83 Fed. Reg. 6364, 6369 (Jan. 9, 2018) (emphasis added). Based on the CFPB's interpretation of the "general public," defendants were entitled to, and did, rely in good faith upon the CFPB's official guidance, which expressly stated that "prison release cards" are "products that are not marketed to the general public." Thus, plaintiff's claim for violation of section 1693*l*-1 fails to state a claim and must be dismissed.

> **2.    Before the adoption of the 2019 Prepaid Rule, the definition of "account" in section 1693i explicitly did not include pooled accounts that funded prepaid cards.**

The provisions of section 1693i of the EFTA apply only to cards that access consumer accounts. 15 U.S.C. § 1693i(a). Regulation E further provides that a consumer "account" is one that is "established primarily for personal, family, or household purposes." 12 C.F.R. § 1005.2. Defendants could not have reasonably foreseen that the Ninth Circuit would nevertheless interpret a consumer "account" to include a pooled account because, until the adoption of the 2019 Prepaid Rule, a pooled account for a prepaid card program was explicitly considered ***not*** to be a consumer "account" under the EFTA.

Since the advent of prepaid cards, the agencies tasked with enforcing the EFTA—the Federal Reserve and then the CFPB—have considered prepaid cards to be different from consumer "accounts" under the EFTA. *See*, *e.g.*, *Electronic Fund Transfers*, 71 Fed. Reg. 51437, 51441 (Aug. 30, 2006) (Final Rule) (extending Regulation E to cover payroll cards, while explicitly declining to extend Regulation E to prepaid cards); *Electronic Fund Transfers*, 77 Fed. Reg. 30923, 30924–25 (May 24, 2012) (Advance Notice of Proposed Rulemaking) (citing the entire regulatory history of Regulation E and noting general use prepaid cards were not included within the definition of "account"). The CFPB has also explained that the Credit Card Accountability Responsibility and Disclosure Act of 2009, which brought gift cards, gift certificates, and prepaid cards under the EFTA in certain circumstances, applied only to prepaid cards used as gift cards

and not to prepaid cards used more generally as replacement products for checking or deposit accounts. *Id.* In doing so, the CFPB noted that the definition of "account" under the EFTA remained unaltered. *Id.*

When Regulation E was amended in 2010, it was well known and accepted that "pooled accounts" used for prepaid cards were not held in the name of any one recipient, and were not covered by Regulation E. *Federal Government Participation in the Automated Clearing House*, 75 Fed. Reg. 80335, 80336 (Dec. 22, 2010) (Interim Final Rule). The Department of the Treasury explicitly acknowledged that "*[b]ecause Regulation E currently does not cover any prepaid cards other than payroll cards*, we are making the payroll card exception available for prepaid cards . . . if the issuer voluntarily provides all of the protections that apply to payroll cards under Regulation E. . . ." *Id.* (emphasis added). Indeed, a federal agency could not make direct deposit payments payable to prepaid cards because federal direct deposits must be made to a deposit account at a financial institution, and "pooled accounts" for prepaid cards are not considered deposit accounts to which Regulation E applies. *Id.*

Only recently did CFPB bring prepaid cards within the scope of the EFTA and Regulation E—and when it did so, it made clear that prepaid cards were ***not*** previously defined as "accounts." *See* 81 Fed. Reg. 83934, 83946–49, 83970, 83965–66 (Nov. 22, 2016) (Final Rule). As the CFPB explained in the final rule:

> Scope. The final rule's definition of prepaid accounts . . . covers accounts that are marketed or labeled as "prepaid" that are redeemable upon presentation at multiple, unaffiliated merchants for goods or services, or that are usable at automated teller machines (ATMs). It also covers accounts that are issued on a prepaid basis or capable of being loaded with funds, whose primary function is to conduct transactions with multiple, unaffiliated merchants for goods or services, or at ATMs, or to conduct person-to-person (P2P) transfers, and that are not checking accounts, share draft accounts, or negotiable order of withdrawal (NOW) accounts.

*Id*. at 83934.

Thus, the CFPB did not consider prepaid cards to be "checking accounts, share draft accounts, or negotiable order of withdrawal (NOW) accounts." *See id*. Instead, the CFPB recognized that "[p]repaid . . . cards differ from traditional checking or savings accounts in that the underlying funds are typically held in a pooled account at a depository institution or credit union . . . rather than [in] individual accounts for each cardholder." *Id*. at 83940.

In order to regulate prepaid cards under Regulation E, the CFPB concluded it needed to issue a new final rule creating a specific definition for "prepaid accounts"—which is exactly what it did—well after the accrual of plaintiff's claims here. Defendants here were entitled to, and did, rely in good faith upon the official regulatory guidance that was promulgated with respect to the definition of a consumer "account." Thus, plaintiff's claim for violation of section 1693i fails to state a claim and must be dismissed.

## D.    PLAINTIFF'S CLASS ACTION ALLEGATIONS FAIL BECAUSE ALL OTHER MEMBERS OF THE PUTATIVE CLASS ARE SUBJECT TO INDIVIDUAL ARBITRATION REQUIRED BY THE CARDHOLDER AGREEMENT.

Finally, to the extent they are not mooted by the dismissal of her statutory and common law claims, plaintiff's class allegations must be dismissed or stricken because all other putative class members must individually arbitrate their claims under the Cardholder Agreement. Aside from plaintiff, all putative class members here are subject to the broad arbitration agreement included in the Cardholder Agreement.

Moreover, this Court's determination that plaintiff is no longer subject to binding arbitration because defendants waived their right to seek arbitration was specific to plaintiff, and places plaintiff on unique footing compared to the rest of the putative class. The other putative class members were not, and never have been, before the Court. *See Smith v. Bayer Corp*., 564

U.S. 299, 313 (2011) (stating that "[a] court's judgment only binds the parties to a suit" and holding

that "an unnamed member of a proposed but uncertified class" does not qualify as a party). As a

result, any claim any putative class member possesses is still subject to individual arbitration, and

defendants have not waived their right to arbitrate any of those claims. *See*, *e.g.*, *Gutierrez v. Wells

Fargo Bank*, *N.A.*, 889 F.3d 1230, 1238-39 (11th Cir. 2018) (holding the defendant had not waived

its right to arbitrate against unnamed putative class members because prior to certification, "any

plaintiffs beyond those named in the complaint are speculative and beyond the reach of the Court's

power."); *Jackson v. Aliera Cos.*, *Inc.*, No. 19-cv-01281-BJR, 2020 WL 4787990, at *5 (W.D.

Wash. Aug. 18, 2020) ("[D]istrict courts within this Circuit have determined that a party cannot

move to compel putative class members to arbitration prior to class certification because putative

class members are not parties to the action."); *In re Evanston Nw. Corp. Antitrust Litig.*, No. 07-

CV-04446, 2013 WL 6490152, at *4 (N.D. Ill. Dec. 10, 2013) (holding that defendant did not

waive right to arbitrate against unnamed class members).

      Here, the claims of the putative class members—and any damages—are based on allegedly

improper fees they incurred when using the MasterCard prepaid debit release card. Yet the

materials the putative class members received from the Multnomah County jail conspicuously

identified multiple options to receive all of their cash back ***at no cost to them***. In order to be a

member of the putative class in the first instance, a putative class member must have elected ***not***

to take advantage of those options. Instead, in order to be a putative class member, a person must

have accepted and used his or her release card. Under these circumstances, the putative class

members assented to the Cardholder Agreement's terms and conditions. *Citibank South Dakota,

N.A. v. Santoro*, 210 Or. App. 344, 349 (2006) (holding assent to cardholder agreement manifested

by conduct of cardholder in accepting and using credit card).

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM
IN SUPPORT**

Because the claims of putative class members arise from fees incurred by using the release cards, their claims should be resolved by binding arbitration. Congress established a strong national policy favoring arbitration when it passed the Federal Arbitration Act ("FAA"). *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); *Brown v. BYRV, Inc.*, No. 3:14-cv-01213-AC, 2015 WL 4507159 at *7 (D. Or. July 24, 2015) (same). The FAA applies to any arbitration agreement that is "written" and in a "contract evidencing a transaction involving commerce." 9 U.S.C. § 2. Both criteria are met here, as the arbitration agreement is in writing and the Cardholder Agreement between an Oregon resident and an out-of-state bank necessarily involves interstate commerce. Under the FAA, the arbitration agreement is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *See* 9 U.S.C. § 2.

The arbitration provision in the Cardholder Agreement between the putative class members and defendants is very broad. *See Willamette Crest Gaming*, *LLC v. Play N Trade Franchise*, *Inc.*, No. 09-461-ST, 2009 WL 2243811 at *3 (D. Or. July 27, 2009) (characterizing arbitration clause covering "any dispute . . . arising out of or relating to this Agreement" as "very broad"); *Chiron Corp. v. Ortho Diagnostic Sys.*, *Inc.*, 207 F.3d 1126, 1131 (9th Cir. 2000) (holding that arbitration clause covering "[a]ny dispute, controversy or claim arising out of or relating to" the parties' agreement is "broad and far reaching"). The putative class members agreed to arbitrate "any claim, demand, dispute or controversy between [class member] and [defendants] that in any way arises from or relates to [class member's] Card Account (whether past, present or future)." (ECF No. 24-2, Urhausen Decl., Ex. B, § 33(c).) The Cardholder Agreement further provided that the term "Claim" was to "have the broadest possible meaning." (*Id.*) Even to the extent that some putative class members might argue that, despite their acceptance and use of the cards, they are not bound

by the arbitration agreement in the Cardholder Agreement due to the particular facts and circumstances of their experiences, this only further demonstrates the need to adjudicate claims on a case-by-case basis and the impracticability of class treatment of such claims. *E.g*., *Fennell v. Navient Solutions*, *LLC*, No. 6:17-cv-2083-Orl-37DCI, 2019 WL 3854815, at \*5 (M.D. Fla. June 14, 2019) (denying motion for class certification where it was evident that some putative class members would be subject to arbitration, while others would not); *Granger v. Sears Roebuck & Co*., No. 2:05-CV-1696-RDP, 2008 WL 11424140, at \*13 (N.D. Ala. Aug. 4, 2008) ("Indeed, the weight and burden of conducting [] an individualized inquiry into the enforceability of each class member's arbitration provision is enough to warrant denial of certification.").

Here, as the only putative class member not subject to the arbitration agreement in the Cardholder Agreement (due to waiver by defendants), plaintiff is in a class of one. The rest of the putative class is subject to the arbitration agreement and to individual arbitration. Because defendants have waived their right to arbitrate only with respect to plaintiff, her claims are not typical of the claims of putative class members and, due to her unique position, she cannot adequately represent the interests of her proposed class. The existence of a binding individual-arbitration clause in every putative class member's Cardholder Agreement makes it readily apparent that a class can never be certified and warrants the dismissal or striking of plaintiff's class allegations. *See*, *e.g*., *Abdul-Baaqiy v. Fed. Nat'l Mortg. Ass'n*, 149 F. Supp. 3d 1, 10-11 (D.D.C. 2015) (striking class allegations where "[a]ll other members of the possible class are subject to mandatory arbitration before they are free to sue in court"); *In re Online Travel Co*., 953 F. Supp. 2d 713, 725 (N.D. Tex. 2013) (striking class allegations where absent class members were bound to arbitrate their claims individually); *In re H&R Block IRS Form 8863 Litig*., No. 4:13-MD-02474-FJG, 2015 WL 13344628, at \*2 (W.D. Mo. Jan. 7, 2015) (striking class allegations where

absent class members had agreed to individually arbitrate their claims); *see also Pablo v. ServiceMaster Global Holdings, Inc.*, No. C 08-03895 SI, 2011 WL 3476473, at *2 (N.D. Cal. Aug. 9, 2011) (existence of arbitration agreements precluded findings of numerosity and superiority for purposes of class certification).

## IV.    CONCLUSION

For these reasons, defendants request that the Court grant their motion for summary judgment and dismiss plaintiff's Third Amended Complaint in its entirety, with prejudice and on the merits including plaintiff's class allegations.

DATED: August 28, 2020

**HITT HILLER MONFILS WILLIAMS LLP**

*AND*

**FOX ROTHSCHILD LLP**

By: *s/Eric J. Nystrom*
    James L. Hiller, OSB #772220
    jhiller@hittandhiller.com
    Eric J. Nystrom, *Pro Hac Vice*
    enystrom@foxrothschild.com
    John C. Ekman, *Pro Hac Vice*
    jekman@foxrothschild.com
    Natalie I. Uhlemann, *Pro Hac Vice*
    nuhlemann@foxrothschild.com

*Attorneys for Defendants Stored Value Cards, Inc.,*
*d/b/a Numi Financial and*
*Central National Bank and Trust of Enid, Oklahoma,*
*n/k/a Stride Bank, N.A.*

## <u>CERTIFICATE OF COMPLIANCE WITH L.R. 7-2(B)(2)</u>

I certify that this brief complies with the applicable word-count limitation under L.R. 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 6,452 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of authorities, signature block, and any certificates of counsel.

Dated August 28, 2020

<div style="margin-left: 40%;">

*s/Eric J. Nystrom*_____
Eric J. Nystrom, *Pro Hac Vice*
enystrom@foxrothschild.com

</div>